UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BLEECKER STREET, INC., and<br>ANIES ALFAYYAD,<br><br>    Plaintiffs,<br><br>  vs.<br><br>MARC R. FORTNEY,<br>ERIC M. FORTNEY, and<br>FF & F OF INDIANAPOLIS, LLC,<br><br>    Defendants. | Cause No. 1:13-cv-175-WTL-TAB |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the motion for summary judgment filed by Defendants Marc R. Fortney, Eric M. Fortney, and FF&F of Indianapolis, LLC ("FF&F"), against Plaintiffs Bleecker Street, Inc., and Anies Alfayyad (dkt. no. 36). The motion is fully briefed, and the Court, being duly advised, **GRANTS IN PART AND DENIES IN PART** the motion for the reasons set forth below.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court accepts as true the admissible evidence presented by the non-moving party and draws all reasonable inferences in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the

burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The relevant facts of record, viewed in the light most favorable to Plaintiffs, are as follow.

### A. The Parties and Their Relationship

Since 1999, Alfayyad has rented space in a building located in the heart of Broad Ripple Village, on the corner of Broad Ripple Avenue and Guilford Avenue, in Indianapolis, Indiana. The building, commonly referred to by the parties as Broad Ripple Square, houses several retail outlets, including Bleecker Street, a bar owned and operated by Alfayyad. Bleecker Street originally operated as a restaurant and bar. However, in 2007, Bleecker Street closed its restaurant and began operating solely as a bar. Since then, the majority of Bleecker Street's customers have been African-American.

Marc and Eric Fortney own and operate sixteen Brothers Bar & Grill ("Brothers") locations across the country. Together with their father, the Fortneys own FF&F. In 2006, the Fortneys began looking for space in Indianapolis to open a Brothers location. On July 14, 2008, FF&F purchased Broad Ripple Square and assumed Bleecker Street's lease. At that time, Alfayyad was paying approximately $15.45 per square foot in rent. According to Alfayyad, during pre-purchase discussions, FF&F promised to renew his lease at $18.00 per square foot when the lease came up for renewal the following year. After renovating space previously occupied by another tenant, the Fortneys opened a Brothers location in Broad Ripple Square immediately next door to Bleecker Street.

Alfayyad's relationship with his new landlord and neighbor quickly soured. According to the Fortneys, they began receiving complaints about Bleecker Street's clientele before they purchased Broad Ripple Square during the spring of 2008. Various members of the Broad Ripple Village Association reported that Bleecker Street's customers were poorly behaved and often caused problems in the Broad Ripple Village. Complaints about Bleecker Street's clientele continued after Brothers opened in November 2008. In 2008 and early 2009, Brothers General Manager Ryan Schinke told the Fortneys on several occasions that Bleecker Street's customers frequently harassed Brothers' customers and loitered near and against the patio railing outside Brothers. Schinke also regularly witnessed fights that emanated inside or occurred directly in front of Bleecker Street and told the Fortneys about the altercations. In 2008 and early 2009, Brothers' off-duty police security officers witnessed similar issues and discussed the problems with Brothers management. During this time, Schinke also advised Marc Fortney that Bleecker Street was not maintaining its premises in a clean and orderly fashion. Marc confirmed this to be true on several occasions when he observed vomit on Bleecker Street's patio during his inspections of the building.

According to Alfayyad, the Fortneys began expressing their concerns about Bleecker Street's clientele almost immediately after FF&F purchased the building. The Fortneys regularly used the terms "ghetto," "those types of people," and "those kind of people," to identify Bleecker Street's customers and regularly told Alfayyad that he needed "to get rid of these people," because they are not "the kind . . . [they] would like to have around [their] building." Although the Fortney's did not themselves use the terms "black" or "African-American," Alfayyad understood the Fortneys to be referring to African-Americans. Additionally, on one occasion before Bleecker Street's lease was renewed, Alfayyad recorded a conversation he had with Marc

3

Fortney. During the conversation, after Marc expressed his displeasure with Bleecker Street's clientele, Alfayyad said, "You're speaking about black people?" Marc's response was, "Yes, that's what we're talking about." Thus, Alfayyad considered the Fortney's complaints to be racially motivated, rather than motivated by the behavior of his customers.

## B. Rent

Alfayyad's lease was up for renewal on July 1, 2009, approximately one year after FF&F purchased Broad Ripple Square. On October 13, 2008, Alfayyad notified FF&F that he intended to renew his lease for another five years. Based on advice from its real estate agent, Gary Perel, and its lender's commercial appraiser, Taylor Kumler, FF&F determined that an average rent of $25.00 per square foot for all retailers in Broad Ripple Square was appropriate. Ultimately, FF&F proposed a renewal rate of $27.00 per square foot to Alfayyad. In response, Alfayyad suggested that the market rate was $20.00 per square foot, but agreed to pay $25.00 per square foot. On January 20, 2009, after FF&F reevaluated the market, FF&F proposed a revised rental rate of $27.50 per square foot. Alternatively, FF&F offered to reduce Alfayyad's rent to $25.00 per square foot if he agreed to sign an addendum "prohibiting dancing, hip hop music, dj's, live entertainment, and exotic dancers." Dkt. No. 38-23. Alfayyad refused to limit his business in such a way and ultimately agreed to a renewal rate of $27.50 per square foot.

## C. Parking

With regard to parking, Alfayyad's lease stated that he would have "2 spaces – [but] no guarantee of availability." Dkt. No. 38-6. On October 25, 2000, however, Alfayyad's previous landlord wrote a letter to the Metropolitan Board of Zoning Appeals in Indianapolis stating as follows:

> As the landlord for Bleecker Street Restaurant, I am allowing such tenant to use a minimum of thirteen (13) parking spaces behind their location for their patrons

and employees after 5:00 PM each day. This use will be permitted as long as their lease remains in effect.

Furthermore, an appropriate sign shall be posted to put the public on notice that the parking area is for the use and enjoyment of Bardach Awards, Inc.[1] and Bleecker Street.

Dkt. No. 38-34. When FF&F purchased the building, FF&F recognized this letter as part of Alfayyad's lease agreement. Nevertheless, FF&F removed the parking signs specifically reserving spaces for Bleecker Street, and Brothers' employees began using those spaces, to the exclusion of Bleecker Street's employees. FF&F also put up new tow-away zone signs. On one occasion, Alfayyad's own car was almost towed from the lot. According to FF&F, however, Alfayyad's car was not in a parking spot, but was improperly parked in the middle of the lot. Alfayyad complained about the parking situation in June 2013, and Marc Fortney responded with the following statement: "I have instructed [Brothers'] managers that, as has always been the case, Bleecker Street employees and customers are authorized to use the parking lot and will not be towed." Dkt. No. 58-4. Alfayyad also conceded during his deposition that Bleecker Street employees and customers are authorized to use the parking lot, although the lot is generally full before they arrive due to Brothers being a restaurant and bar, and thus open earlier.

### D. Sale of Bleecker Street/Transfer of Lease

In 2008, while FF&F was in the process of purchasing Broad Ripple Square, Alfayyad attempted to sell his business to William Ficca, part-owner of a number of other bars in the Broad Ripple Village. During Ficca's discussions with Marc Fortney, "Fortney talked at length about Bleecker Street's clientele and expressed the opinion that Bleecker Street's clientele was 'not good for Broad Ripple.'" Dkt. No. 47-9. After initial discussions, however, Ficca's associate, Jamie Browning, notified Marc Fortney on May 28, 2008, that they were "not buyers

---

[1] Brothers now occupies the former Bardach Awards space.

at $25.00 net." Dkt. No. 38-30. According to FF&F, "Ficca and Browning's unwillingness to pay $25 a square foot eliminated any need to further discuss the business deal." FF&F's Br. at 22. Thus, the Fortneys did not communicate any further with Ficca and Browning. Indeed, Ficca chastised the Fortneys for their lack of communication in an email on June 6, 2008, stating: "In short, communication has been virtually non-existent, and what little communication there has been has not been terribly constructive." Dkt. No. 38-31. Ficca did, however, acknowledge that he was willing to negotiate a new rental rate. However, because the Fortneys did not want to negotiate down from the $25.00 per square foot rental rate they had previously determined was the target market rate for Broad Ripple Square, again the Fortneys did not respond to Ficca. Shortly thereafter, Ficca withdrew his offer to purchase Bleecker Street.

In 2011, Jon Mangles became interested in purchasing Bleecker Street. Mangles wanted to open a Spanish/South American tapas restaurant in the Bleecker Street space. After providing his business plan and financial information to FF&F, the Fortneys concluded that Mangles' background in the restaurant industry was insufficient and his financials were not strong enough to be a tenant in their building. Apparently, however, this message was not conveyed to Mangles. On October 19, 2011, Mangles wrote the following email to Alfayyad:

> It's been an extremely long wait for your landlord to make a decision. Since the middle of July, you have been telling me that it will [be] another week, and frankly I don't know what to believe anymore. This 3-month protracted delay has brought us into late October. I will not open a restaurant in Broad Ripple in the middle of the winter and I can't wait any longer, so I am withdrawing the agreed upon offer of $400,000 to buy Bleecker Street.

Dkt. No. 47-33.

Russell Allen also expressed interest in purchasing Bleecker Street. Allen wanted to build a "very relaxing bar" in the Bleecker Street space. According to Alfayyad, the Fortneys told Allen that "they [were] not interested in having a bar next door to their bar," and they intended to

6

do something different with the Bleecker Street space after Alfayyad left. FF&F's Br. at 22. As a result, the transaction fell through.

### E. Other Allegedly Discriminatory Acts

During the early morning hours, the employees of Brothers play country music through the bar's loudspeakers. This is also closing time or near closing time for Bleecker Street. According to Alfayyad, the Fortneys play country music at their establishment while Bleecker Street's customers are on the patio or are exiting the bar to send "a special hostile message to the members of the African-American community," and to urge Bleecker Street's African-American patrons to leave the building. Alfayyad's Resp. at 11.

Additionally, from time to time, Brothers' off-duty police security officers have been observed taking photographs of Bleecker Street's customers. According to Alfayyad, this causes concern for Bleecker Street's customers and unspecified problems for Bleecker Street.

### III. **DISCUSSION**

According to Bleecker Street, its allegations against FF&F arise under 42 U.S.C. § 1981. Section 1981 provides, in pertinent part, that "[a]ll persons . . . have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Bleecker Street, however, does not specifically identity what contracts or contractual relationships are at issue in this case. More startlingly, the parties have not addressed the legal basis for each of Bleecker Street's claims of discrimination. Thus, for the purposes of summary judgment, based on the facts presented by the parties, the Court assumes that there are three "contracts" at issue in this case: (1) the lease between Bleecker Street and FF&F, (2) Bleecker Street's "contracts" with its African-American clientele, and (3) Alfayyad's contracts with potential third-party purchasers of Bleecker Street. Accordingly, each claim of discrimination alleged by Bleecker Street must relate to one of the

aforementioned contractual relationships. Because the Defendants have not attacked the legal validity of Bleecker Street's claims, the Court also assumes for the purposes of summary judgment, that each claim is in fact cognizable under § 1981.

### A. Bleecker Street's Lease with FF&F

In relation to its lease with FF&F, Bleecker Street alleges that FF&F discriminated against Bleecker Street's African-American clientele in two ways: (1) it increased Bleecker Street's rent, and (2) it eliminated Bleecker Street's parking spaces. In other words, FF&F increased the rent and eliminated the parking spaces in order to force Bleecker Street out of business and its African-American customers out of Broad Ripple Square.

"We analyze § 1981 discrimination claims in the same manner as claims brought pursuant to Title VII of the Civil Rights Act." *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996) (citation omitted).

> Generally speaking, there are two ways of proving such a claim: the "direct" method of proof and the "indirect" method of proof. . . . Under the direct method, a plaintiff must provide either direct or circumstantial evidence that the employer had a discriminatory motivation. . . . And under the indirect method, a plaintiff must satisfy the well-worn requirements of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*Collins v. Am. Red Cross*, 715 F.3d 994, 999 (7th Cir. 2013) (citations omitted).

Direct evidence would require something akin to an admission by FF&F. *Id.* (citation omitted). No such evidence exists in this case. Alternatively, to prevail under the direct method using circumstantial evidence, Bleecker Street "must 'construct a convincing mosaic' that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Perez v. Thorntons, Inc.*, 731 F.3d 699, 710 (7th Cir. 2013) (quoting *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012)).

> Generally, . . . the pieces of that "mosaic" will fall into three categories. The first includes "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn. . . . The second is "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently." . . . And the third is "evidence that the [defendant] offered a pretextual reason for an adverse . . . action."

*Id.* at 711 (citations omitted).

Bleecker Street's argument related to the parking lot is a nonstarter. Marc Fortney advised Bleecker Street by letter on July 3, 2013, that "as has always been the case, Bleecker Street employees and customers are authorized to use the parking lot and will not be towed." Dkt. No. 58-4. More importantly, Alfayyad conceded during his deposition that Fortney's statement was true. Bleecker Street points to no other parking issues that occurred after Alfayyad's complaints were addressed. Thus, to the extent Bleecker Street's complaint contains a § 1981 claim related to the parking lot issues, the Defendants are entitled to summary judgment on that claim.

With regard to the increased rent, however, Bleecker Street has presented sufficient facts to survive summary judgment. The Plaintiffs have submitted evidence that, before Bleecker Street's lease was renewed, the Fortneys regularly complained to Alfayyad about his customers. He used the terms "ghetto," "those types of people," and "those kind of people," and regularly told Alfayyad that he needed "to get rid of these people," because they are not "the kind . . . [they] would like to have around [their] building." During one discussion Alfayyad had with Marc Fortney, after Marc expressed his displeasure with Bleecker Street's clientele, Alfayyad said, "You're speaking about black people?" Marc's response was, "Yes, that's what we're talking about." Shortly thereafter, Bleecker Street's rent was increased to $27.50 per square foot, $2.50 more per square foot than its target market rate.

9

The Defendants maintain that the aforementioned statements refer to the behavior of Bleecker Street's clientele, rather than their race. In other words, "these people" actually refers to "misbehaved people." That is certainly one inference that could be drawn from the evidence of record; however, a reasonable jury also could infer—depending on what testimony it finds more credible—that the Defendants' displeasure with Bleecker Street was based on the race of its customers. FF&F also argues that it had legitimate business reasons for increasing Bleecker Street's rent. While that may be true, Bleecker Street has presented "sufficient circumstantial evidence to construct the 'convincing mosaic' that would allow a jury to infer that the decision" to increase Bleecker Street's rent was impermissibly biased. *Perez*, 731 F.3d at 711. Thus, the Defendants are not entitled to summary judgment on the issue of whether FF&F discriminated against Bleecker Street when it increased Bleecker Street's rent to $27.50 per square foot.[2]

### B. Bleecker Street's Contracts with Clientele

Bleecker Street has presented no facts regarding whether any of its customers were denied business due to FF&F's alleged statements and actions. There is not even an allegation that the Defendants' conduct caused any customer the inability to purchase goods and services from the restaurant. Thus, to the extent Bleecker Street's complaint purports to assert a claim (or claims) under § 1981 related to its contracts with its African-American clientele, the Defendants are entitled to summary judgment on that claim. *See Painters Mill Grille, LLC v. Brown*, 716 F.3d 342, 349-51 (4th Cir. 2013) (upholding dismissal of case under on same grounds).

### C. Bleecker Street's Contracts with Potential Purchasers

Bleecker Street also argues that FF&F interfered with its right to sell its business and assign its leasehold interest to William Ficca, Jon Mangles, and Russell Allen.

---

[2] Because the Court finds that the Plaintiffs' claims survive under the direct method, it need not consider the Plaintiffs' arguments regarding the indirect method.

> Relief is available under § 1981 where a party discriminatorily uses its authority to preclude an individual from securing a contract with a third party. . . . [T]his requires the individual to show that the party both possessed sufficient authority to significantly interfere with the individual's ability to obtain contracts with third parties, and that the party actually exercised that authority to the individual's detriment.

*Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1197 (10th Cir. 2002). In this case, FF&F had the authority to interfere with the sale of Bleecker Street.[3] Additionally, Bleecker Street has established that FF&F refused to allow Bleecker Street to assign its lease on three separate occasions. Bleecker Street has not, however, alleged sufficient facts to show, or really even suggest, that FF&F's decisions were discriminatory.

The evidence of record shows that, in 2008, FF&F did not consent to Ficca's purchase of Bleecker Street because Ficca and FF&F could not agree on the rent. In 2011, FF&F did not consent to Mangles' purchase of Bleecker Street because Mangles' background in the restaurant industry was insufficient and his financials were too weak. Lastly, FF&F did not consent to Allen's purchase of Bleecker Street because it wanted to utilize the space for something other than a bar. While, as noted above, there is evidence that the Fortneys used the terms "ghetto," "those types of people," and "those kind of people," and Marc Fortney effectively told Alfayyad that he needed to "get rid of black people," those statements were in no way directed at precluding Bleecker Street from selling its business to Ficca, Mangles, or Allen. In short, there is no evidence, let alone direct, indirect, or circumstantial evidence, that FF&F refused to allow Bleecker Street to transfer its lease for discriminatory reasons. Accordingly, to the extent Bleecker Street's complaint alleges a claim (or claims) against the Defendants related to their

---

[3] The lease contained a clause stating, in pertinent part, that Bleecker Street "shall not assign or in any manner transfer [the] Lease . . . without the prior written consent of" FF&F. Dkt. No. 38-6.

refusal to grant consent for Ficca, Mangles, or Allen to purchase Bleecker Street, the Defendants are entitled to summary judgment on that claim.

### D. Other Claims

To the extent Bleecker Street alleges a separate claim (or claims) against FF&F and/or the Fortneys related to the country music played at Brothers' during closing time, or to the photographs taken by Brothers' off-duty police security officers, such allegations, in and of themselves, do not constitute the kind of interference with a contractual interest that gives rise to a § 1981 claim. Additionally, Brothers is not a party to this litigation. Therefore, the Defendants are entitled to summary judgment on any claims related to these acts. To be clear, however, the Court makes no determination as to whether these allegations are relevant to the remaining issue in this case (i.e., whether FF&F discriminated against Bleecker Street when it increased Bleecker Street's rent to $27.50 per square foot).

### IV. CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment (dkt. no. 36) is **GRANTED IN PART AND DENIED IN PART**.

This case remains set for a final pretrial conference on September 19, 2014, at 2:00 pm, and trial on October 14, 2014. The parties are reminded of the required pretrial preparation deadlines set forth in their case management plan.

SO ORDERED: 07/14/2014

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.